UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

WILLARD BENDER, *et al.*,

        Plaintiffs,

v.

NEWELL WINDOW FURNISHINGS, INC., *et al.*,

        Defendants.
_____/

Case No. 1:06-CV-113

HON. GORDON J. QUIST

## OPINION

Plaintiffs, Willard Bender, Don Lampe, Carolyn Connors, and James Taylor, as individuals on behalf of themselves and all persons similarly situated (the "Individual Plaintiffs"), and International Union, United Automobile, Aerospace and Agricultural Workers of America (UAW) (the "Union"), brought this action against Defendants, Newell Window Furnishings, Inc., Kirsch Division, Newell Operating Company, Inc., and Newell Rubbermaid Health and Welfare Program 506 (collectively "Newell" or the "Company"), under Section 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185, and Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Now before the Court is Newell's motion to dismiss pursuant to Rule 12(b)(1), (3) and (6) or, in the alternative, to transfer this case to the United States District Court for the Northern District of Illinois. For the following reasons, the Court will deny Newell's motion to transfer, deny Newell's motion to dismiss the Individual Plaintiffs, and grant Newell's motion to dismiss the Union.

## I. Background

The Individual Plaintiffs and members of the represented class are former employees of Newell who retired prior to January 1, 1994, and their surviving spouses and dependents. The Union, through its former Local Union 797, represented the bargaining unit production and maintenance employees at Newell's Sturgis, Michigan facility until its closure in 2000 or 2001. The Union represented the Individual Plaintiffs during their employment at that facility. The Union and Newell, or Newell's predecessor, were at all times parties to a collective bargaining relationship until the closure of the Sturgis facility. As part of the bargaining agreements, Newell established the Newell Rubbermaid Health and Welfare Program 506 benefit plan (the "Plan") to provide certain health and insurance benefits to the Individual Plaintiffs for life.

In preparation for the closure of Newell's Sturgis facility, Newell and the Union entered into a Shutdown Agreement memorializing "the terms and conditions affecting the employees represented by the Union arising out of the permanent shutdown and relocation of operations[.]" (Shutdown Agreement, Recital 3.) The Shutdown Agreement provided, in part, that the Union would waive claims it had or ever would have against Newell. The Shutdown Agreement also provided that individual employees would have to sign a waiver and release of claims against Newell before receiving the benefits provided in the Shutdown Agreement. The parties signed the Shutdown Agreement on October 2, 2000.

In November 2005, Newell notified the Individual Plaintiffs that it was reducing their health benefits by changing the premiums and co-pays provided in the Plan. On January 12, 2006, Newell filed a complaint against the Plaintiffs in the Northern District of Illinois, seeking declaratory and injunctive relief. Specifically, Newell sought a declaratory judgment that it had not breached the

applicable collective bargaining agreements under the LMRA and had not violated ERISA when it changed the premiums and co-pays of the retirees.

On February 15, 2006, the Plaintiffs filed their complaint against Newell in this Court alleging a breach of the applicable collective bargaining agreements in violation of the LMRA and a breach of the Plan under ERISA, and seeking benefits and declaratory and injunctive relief. Newell filed this motion to dismiss or transfer on April 21, 2006. The Court granted numerous stipulations extending the period for the Plaintiffs to respond to the motion based on the Northern District of Illinois' consideration of its jurisdiction over the related case. (Docket nos. 13, 16, 19, 25.) Following these extensions and the Northern District of Illinois' decision to dismiss the case before it in deference to the matter presently before this Court, the Plaintiffs timely filed their response to Newell's motion on May 9, 2007.

## II. Discussion

**A.    Motion to Dismiss or Transfer to Northern District of Illinois Based on the "First to File" Rule**

Newell argues that this action should be dismissed or transferred to the Northern District of Illinois under the "first-to-file" rule. This rule embodies the well-established principle that "[i]n all cases of concurrent jurisdiction, the Court which first has possession of the subject must decide it." *Smith v. McIver*, 9 Wheat. 532, 22 U.S. 532, 535 (1824). The Sixth Circuit has noted that the rule is "a well-established doctrine that encourages comity among federal courts of equal rank. The rule provides that when actions involving nearly identical parties and issues have been filed in two different district courts, the court in which the first suit was filed should generally proceed to judgment." *Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., Inc.*, 16 F. App'x 433, 437 (6th

Cir. 2001) (quoting *In re Burley*, 738 F.2d 981, 988 (9th Cir. 1984)). A court considering whether to apply the rule should examine: (1) the chronology of the actions; (2) the similarity of the parties; and (3) the similarity of the issues. *See Plantronics, Inc. v. Clarity, LLC*, No. 1:02-CV-126, 2002 WL 32059746, at *2 (E.D. Tenn. July 17, 2002). The rule promotes judicial efficiency and should not be disregarded lightly. *See Xoxide, Inc. v. Ford Motor Co.*, 448 F. Supp. 2d 1188, 1192 (C.D. Cal. 2006). On the other hand, it "is not a rigid or inflexible rule to be mechanically applied, but rather is to be applied with a view to the dictates of sound judicial administration." *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir. 1982). A district court thus has discretion to dispense with the rule where equity so demands. *See Nartron Corp. v. Quantum Research Group, Ltd.*, 473 F. Supp. 2d 790, 795 (E.D. Mich. 2007). "Factors that weigh against enforcement of the first-to-file rule include extraordinary circumstances, inequitable conduct, bad faith, anticipatory suits, and forum shopping." *Zide Sport Shop of Ohio, Inc.*, 16 F. App'x at 437.

This Court adheres to the view, discussed at length in *Daimler-Chrysler Corp. v. General Motors Corp.*, 133 F. Supp. 2d 1041 (N.D. Ohio 2001), that the district court in which the first case is filed should determine whether to apply the first to file rule. Here, the first case was filed in the Northern District of Illinois. While that court considered its jurisdiction, this Court effectively stayed the proceedings by repeatedly granting stipulations to extend the period of time for the Plaintiffs to respond to Newell's motion to dismiss or transfer.

The Northern District of Illinois court dismissed the related case in its entirety.[1] Based on the claims before it, the court examined its jurisdiction under the Declaratory Judgment Act, 28

---

[1] The Defendants here, who are the Plaintiffs in the Northern District of Illinois case, have appealed the court's decision.

U.S.C. § 2201(a). Under that Act, a court with subject matter jurisdiction has discretion to decline to hear the case, including where a declaratory judgment action is "aimed solely at wresting the choice of forum from the natural plaintiff." *See Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 718 (7th Cir. 1987). The court concluded that "[Newell] brought this action here for the sole purpose of choosing a forum by attempting to win a race to the courthouse by filing a declaratory judgment action that anticipated the litigation to be filed by the retirees and the Union." *Newell Operating Co., Inc. v. U.A.W.*, No. 06-cv-50010 (N.D. Ill. Mar. 27, 2007). As a result, the court declined to exercise its jurisdiction and dismissed the case "in favor of the pending class action in the Western District of Michigan." *Id*.

Despite the ruling in Illinois, Newell continues to assert that the Court should transfer this matter. Newell claims that because the Plan is administered within the Northern District of Illinois, that court is the appropriate venue for an ERISA action under 29 U.S.C. § 1132(e). Newell claims that the Northern District of Illinois "ignored the Sixth Circuit's holding that 29 U.S.C. § 1132(a)(3) creates subject matter jurisdiction over claims for declaratory relief under ERISA." (Defs.' Reply Mem. in Supp. of Mot. to Dismiss at 7.) Newell impliedly asserts that the court erred in finding that the Declaratory Judgment Act, rather than ERISA, governed the court's jurisdiction. Newell also argues that the Northern District of Illinois is the only venue where all Plan participants may be joined, such that venue there is proper.

"As a matter of comity among equals, the second judge to get a case should accede to the decision of the court of first-filing, rather than vice-versa." *Daimler-Chrysler Corp.*, 133 F. Supp. 2d at 1044. The Northern District of Illinois, the court where the first action was filed, declined to exercise its jurisdiction because it determined that the action was an attempt to wrest the choice of

5

forum from the natural plaintiffs.[2]  In addition, based on the location of the majority of the Individual Plaintiffs, the Union, and Newell's facility in Michigan, the Court finds no reasonable basis to depart from the principle that this Court should accede to the decision of the court of the first-filing.  Under 29 U.S.C. § 1132(e), cited by Newell as providing the relevant venue requirements, venue is appropriate "in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found[.]"  Therefore, the Court will retain jurisdiction over this matter pursuant to the Northern District of Illinois' determination that this Court is the proper venue.

Furthermore, the action in the Northern District of Illinois having been dismissed in favor of the action before this Court, Newell's argument that the Plaintiffs' claims were counterclaims that must be brought in the Illinois action is moot.

**B.    Motion to Dismiss Based on Shutdown Agreement's Waiver of Claims**

Newell requests that the Court dismiss this matter based on the Shutdown Agreement's waiver of claims provision.  Courts will enforce a knowing and voluntary release of claims provision.  *See Adams v. Philip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir. 1995); *Shaheen v. B.F. Goodrich Co.*, 873 F.2d 105, 106-07 (6th Cir. 1989).

The parties dispute whether the release of claims provision applies to the Individual Plaintiffs and the Union.  When interpreting a collective bargaining agreement[3], a court must "look at the specific language in the context of the entire agreement." *Cincinnati Typographical Union No. 3,*

---

[2] The Sixth Circuit has likewise noted that the Declaratory Judgment Act does not compel a court "to exercise the jurisdiction thus granted to it," and that "[d]iscretion not to hear a declaratory judgment action, even where jurisdiction exists, is undisputed." *Zide Sport Shop of Ohio, Inc.*, 16 F. App'x at 437.

[3] The Shutdown Agreement was a bargained-for agreement between Newell and the Union and was an addendum to the collective bargaining agreement between the parties that was in place at that time. (Shutdown Agreement, Article III, Section 1.)

6

*Local 14519 v. Gannett Satellite Info. Network, Inc.*, 17 F.3d 906, 909 (6th Cir. 1994). "When disputes arise, courts should first look to the explicit language of the agreement to determine, if possible, the clear intent of the parties." *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991). "If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties." *Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of America (UAW) v. Yard-Man, Inc.*, 716 F.2d 1476, 1479-80 (6th Cir. 1983). "Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance." *Armistead*, 944 F.2d at 1293.

The parties cite two relevant provisions in the Shutdown Agreement relating to the Union's and Newell's employees' waiver of certain claims against Newell. Article VIII, Section 1 of the Shutdown Agreement provides:

> By entering into this Shutdown Agreement it is the intent of the Company and the Union to resolve all issues arising out of the employment relationship, including those related to this shutdown and relocation of operations, all wage and benefit issues and all other disputes and to protect the Company against any and all claims by the Union, its successors and assigns, or by the individual employees represented by the Union, their heirs and assigns, except those specifically excepted by this paragraph.  To this end, the Union, on behalf of itself and its successors or assigns, hereby makes the following waiver and release:
> (a)	In consideration of the agreements made herein, the Union, on behalf of itself, its successors and assigns, and consistent with the individual Waiver and Release (attached as "Appendix A"), on behalf of its active members and/or other employees of the Company for whom it acts as the exclusive representative under Section 9 of the National Labor Relations Act, hereby waives, releases and forever discharges the Company from any and all obligations, claims, causes of action, liabilities, grievance or arbitration claims, unfair labor practice charges or actions of any kind (as of the effective date of this Shutdown Agreement), and claims and demands of any kind which the Union now has or ever may have against the Company arising out of the employment relationship, including, but not limited to, any civil action under Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, the Older

>   Workers Benefit Protection Act, the Americans with Disabilities Act, the Rehabilitation Act of 1973, the Family Medical Leave Act, the Civil Rights Act of 1866, the National Labor Relations Act, the Labor Management Relations Act, Labor Management Reporting and Disclosure Act, the Worker Adjustment Retraining Notification Act, any state anti-discrimination statutes, federal common law, state common law, and/or any federal, state or local statute, law, ordinance, regulations or order, the various collective agreements between the Union and the Company, and/or the representative statues of the Union except those claims which are based on alleged violations of this Shutdown Agreement, and individual Worker's Compensation and/or state unemployment insurance compensation claims.
> (b) The Union agrees not to initiate, solicit, encourage or finance any civil action, litigation or administrative claim of any type against the Company covering any matter other than enforcement of the terms of this Shutdown Agreement.
>
> This Waiver and Release is effective only against the Union on behalf of itself, its successors and assigns. Employees shall sign an individual release (attached hereto as Exhibit A) which shall be effective on them, their heirs, executors, assigns or successors, upon their signing the release but in any event, prior to the receipt of any benefits pursuant to the terms of this Shutdown Agreement.

Article III, Section 1 pertains to the automatic termination of the Shutdown Agreement and provides, in relevant part:

>   Upon acceptance of this Shutdown Agreement, this Shutdown Agreement shall become an addendum to the current Collective Bargaining Agreement between the Company and the Union (the stated term of which is June 6, 1998 through June 6, 2003). Upon acceptance of this Shutdown Agreement the parties shall be bound by this Shutdown Agreement and the current Collective Bargaining Agreement and relevant plan documents as modified by this Shutdown Agreement. This Shutdown Agreement and the 1998 Collective Bargaining Agreement and all agreements supplemental thereto shall automatically terminate on March 31, 2001; provided, however, that if the bargaining unit employees remain employed after March 31, 2001 these Agreements shall remain in full force and effect until the date that the last bargaining unit employee is separated pursuant to Article I.

**1. Whether the Release of Claims Provision Automatically Terminated**

The Plaintiffs argue that the waiver of claims provision automatically terminated on March 31, 2001, pursuant to the Shutdown Agreement's terms. Newell argues that the unambiguous language of the waiver provision indicates that the Union's waiver of claims was perpetual and did

8

not terminate. The Sixth Circuit has held that "parties to a CBA may provide for rights that survive the termination of their collective bargaining agreement." *Armistead v. Vernitron*, 944 F.2d 1287, 1294 (6th Cir. 1991) (citing *Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of America (UAW) v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983)). "Whether or not they do so is not settled by statute, but is a question of contract interpretation." *Id*.

In this case, the waiver of claims clause provides that the Union "hereby waives, releases and *forever* discharges the Company from any and all obligations, claims, causes of action, liabilities, grievance or arbitration claims . . . and claims and demands of any kind which the Union now has or *ever may have* against the Company arising out of the employment relationship[.]" (emphasis added). The language of the waiver provision indicates that the parties intended a permanent release of claims, despite the Shutdown Agreement's automatic termination on March 31, 2001.

"As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises." *Yard-Man, Inc.*, 716 F.2d at 1480. The terms "forever" and "ever may have" are unambiguous. Applying the termination provision to the waiver provision would render that provision meaningless. In other words, after releasing its claims against Newell, the Union did not regain the ability to bring claims upon the automatic termination of the Shutdown Agreement on March 31, 2001. Therefore, the release of claims did not terminate with the other provisions of the Shutdown Agreement.

**2.     Dismissal of the Individual Plaintiffs**

The Shutdown Agreement's waiver provision does not regulate the Individual Plaintiffs, all of whom retired prior to 1994. The Shutdown Agreement itself states, "This Waiver and Release is effective only against the Union on behalf of itself, its successors and assigns." (Article VIII,

Section 1.) Employees were required to sign an individual release "which shall be effective on them." (*Id.*) There is no evidence that the Individual Plaintiffs, who were not employees at the time of the shutdown, were required to, asked to, or did sign individual releases. The provision further states that employees must sign the waiver "prior to the receipt of any benefits pursuant to the terms of this Shutdown Agreement." (*Id.*) This also indicates that the release applies only to employees active at the time of the facility's closing, and does not apply to retirees who were already receiving benefits pursuant to previous collective bargaining agreements.

Moreover, there is no indication in the Shutdown Agreement that the Individual Plaintiffs are covered by its terms and conditions. By its own terms, the Shutdown Agreement "constitutes the complete agreement" on the "subject of the permanent shutdown and relocation of the manufacturing operations at the Company's Sturgis, Michigan plant and the resultant separation of employees and elimination of the bargaining unit." Article XIII. To be eligible for the "contractual benefits or benefits as supplemented by or provided under this Shutdown Agreement," employees must have been severed "solely due to the permanent shutdown and relocation of manufacturing operations" and on the seniority list as of September 15, 2000. (Article I, Section 5(a).) The Individual Plaintiffs, whose employment with Newell ended before 1994, do not meet these conditions, and no provision in the Shutdown Agreement discusses retirees or existing retiree benefits. Because the Shutdown Agreement's waiver of claims provision does not apply to the Individual Plaintiffs, the Court will not dismiss the Individual Plaintiffs from this matter.[4] Therefore,

---

[4] Although Newell argues that the Union was "free to bargain regarding retiree health benefits while negotiating the Shutdown Agreement" because retiree benefits are a permissive subject of bargaining, so that the retirees should be bound by the Union's waiver of claims, as the Court discussed, there is no indication that the retirees were contemplated by the terms and conditions of the Shutdown Agreement and no evidence that they waived claims against Newell by signing individual waivers.

10

the remaining issue before the Court is whether the Shutdown Agreement prohibits the Union from participating in or supporting the Individual Plaintiffs' class action.

**3.     Dismissal of the Union**

To determine whether the Union should be dismissed because its participation in this action is barred by the Shutdown Agreement, the Court must determine the extent of the claims waived by the Union. The Shutdown Agreement indicates the parties' desire to "resolve all issues arising out of the employment relationship[.]" (Article VIII, Section 1.)  Subsection (a) of the waiver provision also refers to releasing claims "arising out of the employment relationship." (*Id*.)  The Plaintiffs argue that "employment relationship" refers to the relationship between Newell and its employees at the time of the Shutdown Agreement, and does not include employees who had previously retired. However, the language of the waiver clause indicates that "employment relationship" extends beyond the time period and scope of the facility's shutdown, because the clause states that the intent of the parties is "to resolve all issues arising out of the employment relationship, *including those related to this shutdown* and relocation of operations, *all wage and benefit issues and all other disputes* and to protect the Company against *any and all claims by the Union*[.]" (*Id*.) (emphasis added). Subsection (a) also specifies the Union's waiver of claims "against the Company arising out of the employment relationship, including, but not limited to . . . the various collective agreements between the Union and the Company[.]" (*Id*.)  The Plaintiffs here allege "a breach of the collective bargaining agreements" related to Newell's notification to the Individual Plaintiffs that their pension benefits were to be changed. (Amend. Cmplt. at ¶ 27.)  The only claims excepted by the waiver provision are those "based on alleged violations of this Shutdown Agreement, and individual Worker's Compensation and/or state unemployment insurance compensation claims." (Article VIII,

Section 1.) Subsection (b) further broadly provides that "[t]he Union agrees not to initiate, solicit, encourage or finance *any* civil action, litigation or administrative claim of any type against the Company *covering any matter other than enforcement of the terms of this Shutdown Agreement*." (*Id*.) (emphasis added). In this case, it is undisputed that the subject matter of this claim is not related to the enforcement of the terms of the Shutdown Agreement.

The Plaintiffs argue that subsection (b) "is clearly tied to the parties and claims set forth in" subsection (a), and that the parties did not intend the language in subsection (b) to encompass potential claims not covered by the narrower limitations of subsection (a). (Pls.' Br. in Opp. to Mot. to Dismiss at 6.) While subsection (a) is a waiver of claims the Union may have, i.e., a release or waiver, subsection (b) is an agreement by the Union not to initiate, solicit, encourage, or finance any civil litigation against Newell, i.e., a covenant not to sue. Subsection (b) makes no reference to subsection (a), and there is no indication that the two sections are limited by the other's terms. These subsections are two different things.

The Plaintiffs argue that at the time the Shutdown Agreement was negotiated, the Union was no longer the representative of the retirees, because a Union "cannot diminish or augment already vested rights unless the retirees consented." (Pls.' Br. in Opp. to Mot. to Dismiss at 6 (citing *Allied Chem. and Alkali Workers Local No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181 n. 20, 92 S. Ct. 383, 398 n. 20 (1971)).) The Plaintiffs argue that the Union only represented employees active at the time that the Shutdown Agreement was signed, so that the limiting phrase in subsection (a) that the Union was waiving claims "on behalf of its active members and/or other employees of the Company for whom it acts as the exclusive representative" precludes the application of the waiver to claims pursued by the Union on behalf of the retirees.

12

The Union's broad release of claims on its, or its successor's, behalf precludes it from bringing any claim against Newell other than claims based on violations of the Shutdown Agreement and/or state unemployment insurance claims. Furthermore, under subsection (b), the Union agreed not to initiate or solicit any civil action against Newell, which the Union does not dispute occurred here. Based on the specific language in the Shutdown Agreement that the Union was "forever discharging" Newell from all claims that the Union had or "ever may have" against Newell, including those arising under "the various collective agreements between the Union and the Company," as well as the Union's agreement not to initiate, solicit, encourage, or finance civil actions or litigation of any type against Newell other than for the enforcement of the Shutdown Agreement's terms, the Court finds that the Union should be dismissed from this matter because it is precluded from asserting these claims against Newell under the express terms of the Shutdown Agreement.[5]

### III. Conclusion

For the foregoing reasons, the Court will deny Newell's motion to transfer the case to the Northern District of Illinois, deny Newell's motion to dismiss the named and represented individual Plaintiffs, and grant Newell's motion to dismiss the Union.

An Order consistent with this Opinion will be issued.

Dated: July 9, 2007                                         /s/ Gordon J. Quist
                                                                    GORDON J. QUIST
                                                            UNITED STATES DISTRICT JUDGE

---

[5] While Newell requests that the entire case be dismissed because of the Union's breach of the Shutdown Agreement, the Court does not believe that dismissal of the Individual Plaintiffs is an appropriate remedy.