UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLARD BENDER, et al.,

       Plaintiffs,

                                 CASE NO. 1:06-CV-113

v.

                                 HON. ROBERT J. JONKER

NEWELL WINDOW FURNISHINGS,
INC., et al.

       Defendants.

_____/

## OPINION

This is a contract dispute between employees who retired from a manufacturing plant in Sturgis, Michigan, and the company that later reduced their healthcare benefits. There are two issues at stake in this case: (1) whether a series of collective bargaining agreements granted the retirees vested, lifetime healthcare benefits upon retirement, and, if so, (2) the scope of those benefits. Both sides have moved for summary judgment. After a careful review of the record, the Court agrees that this matter is ripe for decision as a matter of law.

A prime objective of contract law is to protect the justified expectations of the parties. *See UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983); *see also, e.g.*, RESTATEMENT (SECOND) OF CONFLICTS OF LAWS §§ 141 cmt. g, 187 cmt. e (1971). In this case, the language of the contract and the extrinsic evidence permit only one conclusion: the collective bargaining agreements created vested, lifetime healthcare benefits for those employees who retired under them. Uncontradicted testimony from all sides of the bargaining table agrees that the parties intended their contracts to give the plant's retirees vested, lifetime healthcare benefits, including insurance benefits

and full Medicare Part B reimbursement. Even the representatives who negotiated on behalf of management agree with the retirees on these points.

To avoid the impact of this uncontradicted evidence of the parties' actual intention, Defendants would have to show that the contract language the parties used to express their intention utterly failed to do so, and that the language actually expressed an unambiguous intention not to confer vested benefits. Defendants cannot make such a showing. To the contrary, the contract language is so plain that when Defendants were investigating purchasing the Sturgis plant, their own attorneys reviewed the collective bargaining agreements and concluded that the retirees were entitled under them to vested, lifetime benefits. Here, where the language of the collective bargaining agreements, the extrinsic evidence of the actual negotiators on both sides of the table, and Defendants' own after-the-fact due diligence memorandum from the time they purchased the Sturgis plant all agree on the key point of lifetime vesting of healthcare benefits for qualified retirees, there is no reason for trial, and summary judgment for Plaintiffs is appropriate.

## FACTS

### I.    The Parties

When it was in operation, the Sturgis plant manufactured window furnishings, primarily drapery hardware and window blinds. Plaintiffs represent a class of bargaining-unit employees who retired from the Sturgis plant before July 31, 1998, and their spouses, surviving spouses, and eligible dependents. The Sturgis plant shut down in 2003. Defendants are the last owners of the plant and the successors in interest to the collective bargaining agreements on which this dispute is premised. Newell Rubbermaid Health and Welfare Program 506 (the "Plan") is the benefit plan, established

by the collective bargaining agreements, that provides certain health and insurance benefits to the Plaintiffs.

## II.     Transfers in the Ownership of the Plant and its Liabilities

Several different companies owned and operated the Sturgis plant over the years. In the 1970s, Kirsh Company owned and operated the Sturgis plant. In 1981, Cooper Industries purchased the Sturgis plant from Kirsch Company. Cooper Industries called the Sturgis plant Kirsch Company, and made it a wholly owned division of Cooper Industries. In 1996, in anticipation of selling the Sturgis plant, Cooper Industries created Kirsch Incorporated, a Delaware corporation, as a new subsidiary. Cooper Industries transferred the Sturgis plant and its related assets and liabilities to Kirsch Inc. in exchange for the corporate stock of Kirsch Inc. The Asset Transfer Agreement expressly transferred to Kirsch Inc. the liabilities related to the collective bargaining agreements. (Newell Master Ex. BW.) Newell Company then purchased the Kirsch Inc. stock from Cooper Industries. (Newell Master Ex. BY.) Newell Company changed the name of Kirsch Inc. to Kirsch Company. Kirsch Company was operated as a wholly owned subsidiary of Newell, then later merged into Newell Window Furnishings, Inc. and run as a division. These documents establish that Defendants are successors in liability to the benefits guaranteed under the collective bargaining agreements.

## III.    The Collective Bargaining Agreements

While the Sturgis plant was operational, the Union and the company that owned the plant negotiated a collective bargaining agreement approximately every three years. Each collective bargaining agreement guaranteed certain health benefits to employees who retired during the time the agreement was in effect, along with their spouses, surviving spouses, and dependents.

A.      **Language in the Collective Bargaining Agreements**

1.      **General Healthcare Benefits**

The relevant provisions of the collective bargaining agreements for the retirees fall into three distinct time frames:  the 1971 to 1985 agreements; the 1985 to 1993 agreements; and the 1993 and later agreements.  Each group of contracts establishes somewhat different benefit levels, but all contracts include some common language relevant to the vesting issue.

There are five collective bargaining agreements covering the Sturgis plant in the first time frame, between 1971 and 1985.  These agreements used identical language to provide retirees and their dependents with health insurance benefits.  Each established an insurance program for employees, including "group insurance benefits, paid by the Company and underwritten by Aetna Life Insurance Company."  In each collective bargaining agreement, "[t]he benefits of the program are set forth in a booklet and policy, a copy of each to be available to every employee."  Each agreement provides these benefits to retirees by guaranteeing "[t]he same benefits [to retirees] as for the employees and their dependents."  Furthermore, "[t]he Company agree[d] to pay the cost of such insurance for the retiree and his dependents."  (docket no. 219-11 & 12, Defendants' Master Ex. BT, at 728, 791-94 (1971-1974 collective bargaining agreement); docket no. 227-17, Plaintiffs' Master Ex. 16.16, at 638, 654-56 (1974-1977 collective bargaining agreement); docket no. 227-16, Plaintiffs' Master Ex. 16.15, at 495, 555-57 (1977-1980 collective bargaining agreement); docket no. 227-15, Plaintiffs' Master Ex. 16.14, at 400, 417-20 (1980-1983 collective bargaining agreement); docket no. 229-2, Plaintiffs' Master Ex. 17.7, at 56, 101-05) (1982-1985 collective bargaining agreement).)

The three collective bargaining agreements covering 1985 through 1993 changed some of the benefits provided to retirees. In particular, they required that retirees aged 62-65 pay $20 per month toward the cost of their insurance. (docket no. 229-3, Plaintiffs' Master Ex. 17.8, at 44, 101-05 (1985-1988 collective bargaining agreement); docket no. 229-4, Plaintiffs' Master Ex. 17.9, at 43, 79-81; docket no. 229-5, Plaintiffs' Master Ex. 17.10, at 44, 80-84 (1991-1993 collective bargaining agreement).) In all other material respects, the 1985-1993 collective bargaining agreements provided the same benefits as those provided under the 1971-1985 agreements. Moreover, the language germane to the retiree vesting was identical to the earlier contract language.

The 1993 collective bargaining agreement changed materially the ability of the Sturgis plant's employees to retire with insurance benefits. It provides that employees who retired before January 1, 1994, are covered under the Cooper Industries Comprehensive Retiree Medical Plan, with the benefits guaranteed under the previous collective bargaining agreements. (docket no. 229-6, Plaintiffs' Master Ex. 17.11, at 95.) Employees who retired on or after January 1, 1994, however, were entitled to significantly reduced benefits. Those benefits included, at most, "five years of post-retirement medical coverage," with no coverage past the age of 65. (*Id.* at 94-95.) Additionally, employees who retired after January 1, 1994, are required to contribute to the plan a monthly dollar amount set at the time the employee retired. (*Id.* at 94-95.) The vesting language for employees retiring before January 1, 1994, traces the vesting language used in the earlier collective bargaining agreements. Moreover, the prospective reduction of retiree healthcare benefits provided an obvious incentive for employees to retire before the key January 1, 1994, date.

## 2. Medicare Part B Benefits

One independent aspect of the overall retiree health-care benefit is Medicare Part B insurance. The Medicare Part B benefit pays for the retirees' Medicare Part B insurance, which dovetails with the retirees' group health insurance to provide an overall package of healthcare benefits. Medicare Part B insurance comes at a cost to qualified participants. The premium charge from the government has increased over time, from an average of $5.70 per person per month in 1971 to $110.50 today. The question is how much, if any, of the premiums the retirees are obligated to pay under the agreements.

The collective bargaining agreements require retirees to enroll in Medicare Part B, and they provide two mechanisms for paying the Medicare Part B insurance premiums of the retirees. First, the early collective bargaining agreements provided that "the Pension Agreement, dated July 1, 1957, as amended" would cover the premium amount applicable at the time. (*See, e.g*, docket no. 227-18, Plaintiff's Master Ex. 16.17, at 751.) Each collective bargaining agreement called for amendment to the Pension Agreement to provide an increase in the Medicare Part B premium benefit so that it would match the premium then in effect. For instance, the 1971 agreement provided a "Medicare benefit of $5.60 per month for the retiree and spouse." (*Id.*) Similarly, the 1977 Pension Agreement increased the benefit to $6.70, then the premium in effect, for retired employees who were "enrolled in Medicare Part B." (docket no. 227-22, Plaintiffs' Master Ex. 16.21, at 945.) The 1977 Pension Agreement further increased the payment to $7.70 as of July 1, 1977. (*Id.* at 947.) Under the early collective bargaining agreements, the Pension Agreement fully paid for the retirees' Medicare Part B premium cost.

Second, beginning in 1980, the collective bargaining agreements guaranteed that the company would reimburse the retiree for any portion of the Medicare Part B premium not covered by the Pension Agreement.  At that time, the Pension Agreement stated that the pension plan would pay a Medicare Part B premium benefit at "the rate then in effect . . . but not to exceed in any event the amount of $11.70." (docket no. 175-18, Plaintiffs' Bates no. 976.)  That was the last amendment to the Pension Agreement that increased the Pension Agreement's contribution to the Medicare Part B premium.  Indeed, from that point on, it appears that the company and the Union could not agree upon amendments to the Pension Agreement that corresponded with each new collective bargaining agreement.  In practice, however, full, reimbursement of the Medicare Part B premiums continued with the company paying directly any amounts above the pension plan contribution.  Retirees bore no out-of-pocket expense for the Medicare Part B premium.

Separate contract provisions document and implement the agreement.  The collective bargaining agreements required active employees who reached the age of 65 to sign up for Medicare Part B and guaranteed that the company would reimburse the employee for the full cost.  For example, the 1980 addendum to the 1977 collective bargaining agreement stated:

> Active employees attaining age 65 will be required to subscribe to Medicare-Part B with Kirsch Company reimbursing said employees for the full cost of such Medicare coverage.  This will allow active employees, age 65 and over, to maintain the same level of benefits enjoyed prior to age 65.

(docket no. 194-3, Plaintiffs' Bates no. 829.)  This health benefit was then provided to the retirees, their spouses, and dependents by provisions that gave the retirees all the health benefits given to active employees as of June 1, 1980.  (*See, e.g.,* docket no. 229-2, Plaintiffs' Master Ex. 17.7, at 105.)  Accordingly, beginning in the 1980s, the retiree's Medicare Part B premium was paid in part

by the Pension Agreement and in part by reimbursement from the company. But regardless of what sources paid the premium, one thing was clear: the retirees had no out-of-pocket obligation to contribute to the Medicare Part B premium. Rather, employer sources committed to cover the full cost.

A later settlement agreement between the Union and the company documents the same arrangement, providing retirees with payment of the full Medicare Part B insurance premium through reimbursement from the company. The issue leading to the Settlement Agreement involved only a source of payment issue: namely, whether the pension plan money or company money would cover the Medicare Part B reimbursement costs, and in what amounts. There is no evidence that the retirees themselves systematically received anything less than full reimbursement from whatever source throughout the period. The 1998 Settlement Agreement did resolve the funding source issue, and in so doing reinforced the vested contractual obligation of full Medicare Part B premium reimbursement for qualified retirees.

The Settlement Agreement recognized, of course, that the pension plan contribution – whatever it turned out to be – was vested as a matter of ERISA law. *Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064, 1069 (6th Cir. 2008). The question was what additional amounts the company would independently reimburse for Medicare Part B premium costs above the pension plan contribution. For all "retirees of record as of July 31, 1998," the Settlement Agreement provided full "Medicare Part 'B' coverage that was provided for under the Pension Plan in effect in 1991, but deleted from the plan during 1991, and then reimbursed to retirees, from assets of the company." (Docket no. 227-19, Plaintiffs' Master Ex. 16.18.) It thereby confirms that the company will reimburse these retirees for any cost of the Medicare Part B premium that is greater than the pension payment (*see*

*id.*), just as it had been doing since the 1980s. The class of retirees covered by this case includes only those who retired July 31, 1998 or earlier. This is the group guaranteed full reimbursement under the Settlement Agreement. For employees who retired to pension after that date but before August 1, 2002, by contrast, the Settlement Agreement provides that the company will reimburse Medicare Part B coverage up to $43.80 per month for each eligible person. (*Id.*)

**B.     Extrinsic Evidence of the Parties' Intent**

The extrinsic evidence in this case is entirely one-sided. It demonstrates that the parties intended to vest lifetime healthcare benefits for qualifying retirees.

**1.     General Healthcare Benefits**

Robert Keasey, the Manager of Labor Relations at the Sturgis plant during the time it was owned by Kirsch and Cooper Industries, testified at deposition that the company intended to provide retirees with fully paid, vested, lifetime medical benefits. He was directly involved in the negotiations with the Union over the collective bargaining agreements, and he had an "[e]xtensive role" in drafting the language in the agreements. (docket 224-10, Plaintiffs' Master Ex. 9, at 17.) He participated in the negotiations of all of the collective bargaining agreements except for the 1988 collective bargaining agreement, when he was out of the state. (*Id.* at 15.) He stated that the company referred to the benefits as "cradle to the grave," and that a retiree had the insurance plan "until you died." (*Id.* at 18.) He further stated that the company described the pre-1986 insurance benefits as the "First Dollar Plan," because "there was no deductibles, everything was paid, you just went to the doctor . . . and it was 100 percent." (*Id.* at 20.) Mr. Keasey also testified that if an employee was vested under the pension plan, the employee was covered by the retiree health insurance. (*Id*. at 21.) He also stated that the extent and nature of the retiree benefits was very

thoroughly discussed in negotiations because they were very important to the parties, and that there was "nobody in the negotiating room who could have understood it any different [than] people had insurance for the rest of their life." (*Id*. at 25.)

Mr. Keasey also explained the shifts in the benefits that occurred in 1986 and 1994. He stated that Cooper Industries took over the Sturgis plant in 1981 and made clear in the negotiations over the 1985 collective bargaining agreement that it was going to change the retiree health insurance benefits "or there would be no [plant] in Sturgis." (*Id.* at 26.) The Cooper Comprehensive Plan was not as favorable as the First Dollar Plan, but it was still a lifetime plan. (*Id.* at 31, 39.) He stated that this understanding was expressed clearly at the negotiations by the Union and the company. (*Id.* at 31-32, 52-53.)

Indeed, in the 1993 negotiations, Cooper Industries eliminated the "cradle to the grave" concept and limited the time in which retirees were eligible to receive insurance benefits. (*Id.* at 18, 30.) The Union and the company negotiated a delay before the change took place, however, to give "a window period for employees to decide whether they wanted to retire early or continue on and lose their insurance all together." (*Id.* at 30-31.) Mr. Keasey testified that, immediately prior to the change, the number of employees who retired went up significantly. (*Id.* at 32.)

Sandi McCurry, the administrator of health insurance and pension benefits at the Sturgis plant, also stated in her affidavit that the company intended to provide retirees with fully paid, vested, lifetime medical benefits. She worked at the Sturgis plant from 1974 until the plant closed in 2001. (docket no. 224-7, Plaintiffs' Master Ex. 6, ¶ 2.) From 1988 on, she oversaw the administration of health insurance for the employees and the retirees. (*Id.*) Just before the plant closed, she also oversaw the pension administration. (*Id.*) She stated that the retiree benefits were

lifetime for employees who retired prior to January 1, 1994. (*Id.* at ¶ 8.) Additionally, she stated that there was an unusually high number of retirements just prior to January 1, 1994, because of the prospective change from lifetime insurance. (*Id.* at ¶ 13.) She also stated that, as part of her duties for Newell, she had prepared summaries of the benefits for various groups of the retirees. (*Id.* at ¶ 3.) In 1998, she communicated with Linda Fazio of Newell Company and confirmed that for all retiree groups prior to January 1, 1994, there were no monthly premium charges for insurance. (*Id.* at ¶ 9; docket no. 229-11, Plaintiffs' Ex. 17.16.) She described the only exception as the $20 premium payment from age 62 to 65 that was required of employees who retired between January 1, 1986, and January 1, 1994. (docket no. 224-7, Plaintiffs' Master Ex. 6, ¶ 7.)

Donald Lampe, a participant in the 1993 collective bargaining agreement negotiations, stated in his affidavit and at deposition that the company understood the collective bargaining agreement provided lifetime insurance at no cost to the retiree and the retiree's spouse other than the $20 payment for retirees aged 62 to 65. (docket no. 224-5, Plaintiffs' Master Ex. 4, ¶ 4; docket no. 225-2, Plaintiffs' Master Ex. 10, 6, 9.) He stated that Bernard Koehne, the company's lead negotiator, confirmed this understanding at the negotiations. (docket no. 224-5, Plaintiffs' Master Ex. 4, ¶¶ 4, 10; docket no. 225-2, Plaintiffs' Master Ex. 10, 9 ("Bernie Koen [sic] told us that if you got out by the end of the year of '93, you'd have your lifetime benefits.").) His notes, taken during the 1993 negotiations, also state that Mr. Koehne took this position in the negotiations. (docket no. 224-5, Plaintiffs' Master Ex. 4, ¶ 10; docket no. 227-26, Plaintiffs' Master Ex. 16.25.) Additionally, Mr. Lampe stated that the collective bargaining agreements provided the same benefits during the same time periods described by Mr. Keasey. (docket no. 224-5, Plaintiffs' Master Ex. 4, ¶¶ 5-11.) He stated that during his entire career, "there was never any dispute between the Company and the

Union concerning the application of the retiree medical insurance benefit language in the contract." (*Id.* at ¶ 14.)

Donald Oetman, an International Representative for the union at the Sturgis plant from 1984 through 1995, stated that the parties intended that retirees receive lifetime medical benefits, including Medicare Part B reimbursements. (docket no. 224-6, Plaintiffs' Master Ex. 5, ¶ 4.) He was one of the union negotiators for the 1985 collective bargaining agreement. (*Id.* at ¶¶ 2, 3.) He stated that, in the 1985 negotiations, "the Company agreed to pay the Medicare Part B reimbursement so long as the retiree was receiving Medicare. This meant for life." (*Id.*) He stated in addition that, during the 1993 negotiations when the lifetime benefits were phased out for employees retiring after January 1, 1994, the parties intended that employees retiring prior to this date would lock into the lifetime benefits that had previously been offered at the plant. (*Id.* ¶ 6.)

In short, the testimony of company management, union representatives, and line employees is unanimous and uncontradicted: The parties to the collective bargaining agreements intended to vest lifetime health-care benefits for employees retiring before January 1, 1994.

The extrinsic documents tell the same story. The company documents from the time of the negotiations, like the company's economic offer during the 1985 negotiations, states that retirees are "covered under the group medical program . . . except that, from age 62 to 65, retiree contribution will be $20.00 per month for individual coverage and $20.00 per month for family coverage." (docket no. 227-28, Plaintiffs' Master Ex. 16.27.) The company also described this intent in the letters Cooper Industries sent to employees of the Sturgis plant on their retirement. When an employee announced his retirement, the company sent him a letter outlining his pension and

insurance benefits. All of these letters state there is no charge for retiree health insurance benefits. For example, the company sent a letter to a prospective retiree on April 26, 1988, stating:

> Beginning January 1, 1986, Cooper Industries provided a new retiree medical plan for all Kirsch UAW employees and retirees whose retirement commenced on or after January 1, 1986. . . . Your cost for coverage will be $20 each month from age 62 until age 65 ($20 for yourself and for your spouse). There is no charge beyond age 65. . . ."

(docket no. 227-27, Plaintiffs' Master Ex. 16.26.) This language was included in letters the company sent to prospective retirees through 1993. (*See, e.g.*, docket no. 227-4, Plaintiffs' Master Ex. 16.3 (a letter sent to a retiree in 1992); docket no. 227-3, Plaintiffs' Master Ex. 16.2 (a letter sent to a retiree in 1993).) Similarly, the retirement applications the company sent to an employee when she retired also specify that there is no charge for retiree medical insurance, other than the $20 monthly premiums for retirees between the ages of 62-65 in the 1986-1993 retiree group. (*See, e.g.*, docket no. 227-2, Plaintiffs' Master Ex. 16.1 (Mr. Bender's retirement papers); docket no. 227-7, Plaintiffs' Master Ex. 16.6 (Mr. Lampe's retirement papers).) These retirement applications state that, under the 1985 contract, a retiree must pay $20 each month toward the cost of his insurance if he is between the ages of 62 and 65. The applications do not describe or require any other premium payment by the retiree. (*Id.*)

### 2. Medicare Part B Benefits

The extrinsic documentary evidence further demonstrates that the parties intended the pre-August 1, 1998, retirees receive full reimbursement for the Medicare Part B insurance premium. The 1985 bargaining summary, for example, states that Cooper Industries "will reimburse the retiree and spouse for the cost of the Part 'B' Medicare contribution." (docket no. 227-28, Plaintiffs' Master Ex. 16.27.) Similarly, in 1988, Cooper Industries' Labor Relations Manager sent a letter to the

employees describing the agreed upon medical benefits.  (docket no. 227-27, Plaintiffs' Master Ex. 16.26.)  It stated that "[t]he Company will reimburse the retiree and spouse for the cost of Part 'B' Medicare contributions."  (*Id.*)  The same letter was sent in 1992 and 1993 to employees who had indicated that they intended to retire.  (*See, e.g.*, docket no. 227-4, Plaintiffs' Master Ex. 16.3.)  Additionally, the retirement applications show that the company was reimbursing Medicare Part B insurance premiums for retirees.  (*See, e.g.*, docket no. 227-2, Plaintiffs' Master Ex. 16.1 (Mr. Bender's retirement papers); docket no. 227-7, Plaintiffs' Master Ex. 16.6 (Mr. Lampe's retirement papers).)

The testimony also demonstrates this intent.  For example, Donald Oetman, an International Representative for the union at the Sturgis plant from 1984 through 1995, stated that the parties intended that retirees receive lifetime medical benefits, including Medicare Part B reimbursements.  (docket no. 224-6, Plaintiffs' Master Ex. 5, ¶ 4.)  He stated that, in the 1985 negotiations, "the Company agreed to pay the Medicare Part B reimbursement so long as the retiree was receiving Medicare.  This meant for life."  (*Id.*)

William Webster, the International Representative for the union after Mr. Oetman, also confirmed the Medicare Part B reimbursement.  He was part of the team that negotiated the 1998 Settlement Agreement for Medicare Part B reimbursement.  (*Id.*)  He stated that the 1998 Settlement Agreement required the company "to pay the Medicare Part B reimbursement to those who retired prior to August 1, 1998."  (*Id.*)  For those who retired after that date, the company would reimburse only a flat amount of $43.80, even if Medicare Part B premiums increased above that threshold in the future.  (*Id.*)  He also stated that, after the plant closed, pre-August 1, 1998 retirees sometimes called him to complain that they were not receiving full reimbursement, usually after an increase in

the Medicare Part B.  (*Id.* at ¶ 5.)  Whenever he received such a call, he contacted a representative at Newell, and in each case, Newell increased the reimbursement to the new level.  (*Id.*)

There is no contrary testimony in the record.

### C.  Defendants' Due Diligence Memorandum

Newell Company conducted due diligence on the Sturgis plant in 1997, just before Defendants purchased the Sturgis plant from Cooper Industries.  As part of this information gathering, Defendants' legal counsel, Schiff Hardin & Waite, sent them a memorandum that sets forth "a summary of the retiree medical and life insurance benefits currently provided to Kirsch employees." (docket no. 226-4, Plaintiff's Master Exhibit 15.3.)  The memorandum, dated January 21, 1997, was prepared by Lauralyn B. Bengel, a partner at the law firm who specializes in retirement and welfare plans under ERISA.  Copies of it were sent to Stuart Goodman, another partner at the firm; Dale Mattschullat, the Vice President and General Counsel of Newell Company who signed the Kirsch purchase agreement on behalf of Defendants; and Great West Life, the company Defendants hired to duplicate the Cooper-Aetna medical insurance plans for the Sturgis plant retirees.

During this litigation, the retirees did not receive a copy of this memorandum directly from the Defendants.  Instead, a portion of the memorandum was turned over to Plaintiffs by a third party, insurance company Great West Life, in response to a subpoena for documents.  It appears from the fax information across the top of the memorandum that Defendants provided the memorandum to Great West Life sometime around May 1997, when, on behalf of Defendants, Great West Life was taking over the Cooper-Aetna medical insurance plans for the Sturgis plant retirees.  Of course, by disclosing portions of the memorandum to a third party, the company waived whatever attorney-

client privilege may otherwise have protected it, at least as to the disclosed portions. Defendants have not disclosed or offered to disclose the entire memorandum, and Plaintiffs have not sought to compel its production. Accordingly, there is no need to resolve whether the partial third-party disclosure operated as a broader waiver of privilege with respect to the entire document.

The portion of the memorandum actually disclosed to the third party is explicit, unqualified and adverse to the Defendants' position here. In the paragraph titled "Union Employees," the memorandum states: "If retired prior to 1-1-94: Lifetime retiree coverage." (*Id.*) Thus, the conclusion of Defendants' own due-diligence attorneys is consistent with all of the other evidence in this matter in calling for lifetime vesting of benefits for qualifying retirees.[1]

## IV.     The Present Dispute

In 2005, Defendants notified the retirees that they were reducing the retirees' health benefits by requiring for the first time that retirees pay monthly premiums and by changing the co-payments provided in the Plan. (docket no. 31, July 9, 2007, Opinion, at 2.) More recently, Defendants also asserted that they are not required to fully reimburse the retirees' Medicare Part B insurance premium even for employees retiring prior to August 1, 1998, under the Settlement Agreement. Those were the first formal declarations by the Defendants of a claimed legal right to reduce the retirees' healthcare benefits.

---

[1] The record includes only a portion of the due diligence memorandum – namely, the portion covering retiree health care insurance. Whether another portion of the memorandum addresses reimbursement of Medicare Part B premiums, whether from the Pension Plan or the company, is an unknown. As the original recipients of the due diligence memorandum, Defendants are in the best position to eliminate the unknown. They have not done so.

The subject matter of this litigation began with a forum fight.[2] Defendants here fired the first shot by filing suit on January 12, 2006, in the Northern District of Illinois, seeking declaratory and injunctive relief. Specifically, Defendants (the plaintiffs in that action) sought a declaratory judgment that they had not breached the applicable collective bargaining agreements under the LMRA and had not violated ERISA when they changed the premiums and co-pays of the retirees. (*Id.* at 2-3.) Defendants individually joined and served every individual member of the Plaintiff class in this action. On February 15, 2006, the Plaintiffs filed their class-action complaint against the Defendants in this Court. Plaintiffs alleged that Defendants breached the applicable collective bargaining agreements in violation of the LMRA, and that they breached the Plan under ERISA, by reducing healthcare benefits for retirees. Plaintiffs sought benefits and declaratory and injunctive relief. The Court provided numerous extensions in this action to permit the Northern District of Illinois to consider its jurisdiction over the related case. Ultimately, the Northern District of Illinois decided to dismiss the case before it in deference to the matter presently before this Court (*id.* at 3.), and the Seventh Circuit affirmed. *See Newell Operating Co. v. U.A.W.*, 532 F.3d 583, 591-92 (7th Cir. 2008). This Court became the forum for decision on the merits.

The fundamental issue is whether the retirees health insurance and Medicare Part B reimbursement are vested, or whether Defendants retained the right to reduce, or even to eliminate, these benefits for the retirees. Assuming at least some retiree benefits are vested, the remaining

---

[2] The law in the Sixth and Seventh Circuits differs on at least one important aspect of retiree vesting of healthcare benefits. The Sixth Circuit holds "that retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064, 1069 (6th Cir. 2008) (internal quotation marks and alteration omitted). The Seventh Circuit, by contrast, holds that in the absence of explicit language vesting the benefits, healthcare benefits are not vested. *See Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481 (7th Cir. 2006).

issues are the particular way these benefit levels differ for class members depending on the benefit package in place at the time of a qualifying retirement. These issues are framed by eight motions for summary judgment. Newell Operating Company filed a motion for summary judgment (docket no. 160). The Plan filed a motion for summary judgment (docket no. 166). Newell Window Furnishings filed separate motions for summary judgment as to each of the named Plaintiffs Mr. Smoker (docket no. 162), Ms. Rohr (docket no. 164), Ms. Connor (docket no. 168), Mr. Lampe (docket no. 173), and Mr. Taylor and Mr. Bender (docket no. 176). Finally, Plaintiffs also filed a motion for summary judgment (docket no. 171). Plaintiffs and Defendants filed responses and replies to each of the motions (docket nos. 188, 189, 194, 195, 196, 198, 199, 200, 201). Defendants further filed a surreply to Plaintiffs' motion for summary judgment (docket no. 203). Oral argument occurred on April 14, 2010. (*See* docket no. 222) The Court has been well briefed and is prepared to decide the motions.

## ANALYSIS

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 363 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56). The moving party must "inform the district court of the basis for its motion," and it must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (internal quotation marks omitted). "In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party." *Id.* (quotation omitted). Applying these

standards, Plaintiffs are entitled to summary judgment because the language of the collective bargaining agreements and all the extrinsic evidence tell one uncontradicted story: The parties who negotiated the agreements at issue intended to provide lifetime, vested healthcare benefits for retirees at levels established as of key milestone retirement dates. In particular, all Plaintiffs whose qualifying retirement was on or before July 31, 1998, are entitled to full reimbursement of the Medicare Part B premium. Other healthcare benefit levels for Plaintiffs depend on precisely when the qualifying retirement occurred.

## I. Defendants are liable as successors for the retirees' healthcare benefits.

All of the collective bargaining agreements in this action arise from bargaining between one Union and the owners of one plant in Sturgis, Michigan, that, for the entire time it was open, made window furnishings. All of Plaintiffs are retirees from that Sturgis plant. The same Union represented all of them while they were employees. All of them manufactured the same goods. The only thing that changed over the years was who owned the Sturgis plant. Defendants are the successors in liability to all of those collective bargaining agreements.

### A. Newell Window is liable for the retirees' healthcare benefits.

Newell Window, a subsidiary of Newell Operating, is the successor to Kirsch Company, and it agreed to assume all liability arising from the benefit plans related to the Sturgis plant. Newell Window itself recognized this in its Illinois complaint. (*See* docket no. 230-10, Plaintiff's Master Ex. 24, complaint in *Newell Operating Co., Newell Rubbermaid Health & Welfare Program 506, & Newell Window Furnishings, Inc. v. U.A.W. et al.*, No. 3:06-cv-50010 (N.D. Ill. 2007), ¶¶ 4, 7, 8.) In addition to this party admission, Newell Window's due diligence memorandum at the time it

decided to acquire the Sturgis plant reinforces the point. (docket no. 226-4, Plaintiff's Master Exhibit 15.3.)

The underlying transactional documents confirm Newell's admission. Cooper Industries, the earlier owner of the Sturgis plant, transferred the Sturgis plant to Kirsch Inc.[3] (Newell Master Ex. BW §§ 4.1.13, 7.3.). Newell Company then purchased the Kirsch Inc. stock–and thereby, the Sturgis Plant–from Cooper Industries.[4] (Newell Master Ex. BY; *id.* § 5.12.) Each of the transfer agreements expressly transferred to the buyer all liabilities connected with the collective bargaining agreements, the pension agreements, and all pension, retirement, and post-employment benefits. (Newell Master Ex. BW §§ 4.1.13, 7.3; Newell Master Ex. BY § 5.12.) No subsequent agreement permitted Newell Window to amend or terminate the benefits that had already vested to the retirees under the Sturgis plant's plans and agreements. (*See* Newell Master Ex. BY § 6.4(f).) Indeed, no subsequent agreement between the companies or between the company and the Union could lawfully do so. *See, e.g.*, *Wood v. Detroit Diesel Corp.*, No. 09-1252, --- F.3d ----, 2010 WL 2195791, *6 (6th Cir. June 3, 2010) (holding that if the employees had a vested right to a benefit from their employer, then no subsequent agreement between the employer and another party could reduce that right); *see also Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 444 (6th Cir. 2007) (holding that employers are statutorily barred from effectuating unilateral modifications of existing collective bargaining agreements).

---

[3] Cooper Industries created Kirsch Inc. in 1996 for the purpose of selling the Sturgis plant to Newell Company.

[4] Newell Company changed the name of Kirsch Inc. to Kirsch Company. It later merged Kirsch Company into Newell Window Furnishings, Inc. and ran it as a division of Newell Company.

Accordingly, Newell Window is liable for the benefits guaranteed by the collective bargaining and pension agreements.

**B.     Newell Operating and the Plan are liable for the retirees' healthcare benefits.**

Newell Operating is the sponsor of Welfare Program 506. (*See* docket no. 230-10, Plaintiff's Master Ex. 24, complaint in *Newell Operating Co., Newell Rubbermaid Health & Welfare Program 506, & Newell Window Furnishings, Inc. v. U.A.W. et al.*, No. 3:06-cv-50010 (N.D. Ill. 2007), ¶ 2.) Welfare Program 506 provides the retiree health care benefits that are disputed in this case. (*Id.* ¶ 3.) Together with Newell Window, Newell Operating and Welfare Program 506 filed in the Northern District of Illinois a declaratory judgment action in an attempt "to wrest the choice of forum from the natural plaintiffs." (*See id.* ¶ 14; docket no. 31, July 9, 2007 Opinion, at 2, 5-6.) The parties in the present action are the same as those in the declaratory judgment action in the Northern District of Illinois. Indeed, Newell Operating and Welfare Program 506–the very entities who contend in this action that they are not proper defendants–filed the reciprocal of this action, as plaintiffs seeking declaratory judgment, in the Northern District of Illinois. If they were proper plaintiffs in Illinois, they are proper defendants here. Their presence is necessary to ensure complete and effective relief, as they themselves must have recognized when they fired the first shot as plaintiffs in Illinois.

II.     **Under the collective bargaining agreements, the retirees have a vested right to healthcare benefits, including health insurance at levels determined at the applicable retirement date, and full reimbursement for Plaintiffs' Medicare Part B premium.**

A.      **The Collective Bargaining Agreement Language**

1.      **Legal Principles**

"There are two types of employee benefit plans:  pension plans and welfare-benefit plans." *Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064, 1069 (6th Cir. 2008).  Pension plans are subject to mandatory vesting under ERISA.  *Id.*  Welfare-benefit plans are not subject to mandatory vesting under ERISA.  *Id.*  Retiree healthcare-benefit plans are welfare-benefit plans and, accordingly, they are not subject to mandatory vesting under ERISA.  *Id.*  The parties to a collective bargaining agreement, however, may vest the retiree-healthcare benefits and thereby allow the benefits to survive the termination of their collective bargaining relationship.  *UAW v. Yard-Man*, 716 F.2d 1476, 1479 (6th Cir. 1983).  Whether the retiree insurance benefits vest is, like all contract questions, an issue of the parties' intent.  *See id.*; *Cole*, 549 F.3d at 1069.  This circuit's leading case for determining whether the parties to a collective bargaining agreement intended the benefits to vest is *Yard-Man*.  *Cole*, 549 F.3d at 1069.

Under *Yard-Man*, a court must apply the basic rules of contract interpretation to determine whether the parties intended to vest the rights.  *Id.*  The court must first consider the language in the collective bargaining agreement "to see if clear manifestations of an intent to vest are present."  *Id.*  In doing so, the court must construe each of the provisions consistently with the whole, and it should interpret the agreement "to avoid illusory promises and superfluous provisions."  *Id.*  If the collective bargaining agreement is ambiguous, however, "the court may resort to extrinsic evidence to ascertain whether the parties intended for the benefits to survive the agreement."  *Id.* at 1070.  If the available

extrinsic evidence conclusively resolves the issue and no question of intent remains, then summary judgment is appropriate. *Id.* If the extrinsic evidence does not conclusively resolve the issue, however, summary judgment is improper. *Id.*

Additionally, in determining whether the parties intended to vest benefits in a collective bargaining agreement, as opposed to some other type of contract, the court must apply a "*Yard-Man* inference." *Reese v. CNH Am. LLC*, 574 F.3d 315, 321 (6th Cir. 2009). The *Yard-Man* inference requires a court to apply "a thumb on the scales" in favor of concluding that the benefits vested for life. *Id. Yard-Man* "explained that retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Cole*, 549 F.3d at 1069 (internal quotation marks and alteration omitted). Accordingly, if the court "can find either explicit contractual language or extrinsic evidence indicating an intent to vest benefits," it should conclude that the welfare benefits were vested and not "left to the contingencies of future negotiations." *Reese*, 574 F.3d at 321 (alterations omitted). This inference is not "a legal presumption that benefits vest," but it instead is merely an inclination in favor of vesting. *Id.* Ultimately, the plaintiffs "bear the burden of proving that vesting has occurred." *Id.*

If the court concludes that the rights to healthcare coverage are vested in the agreement, then an employer's unilateral termination of the healthcare coverage violates section 301 of the LMRA. *Id.* If the rights to healthcare coverage are not vested, however, an employer may terminate the benefits after the agreement expires. *Id.*

2.    **Analysis**

Here, the retirees have met their burden of demonstrating that the collective bargaining agreements unambiguously gave Sturgis plant employees who retired under them a vested right to healthcare benefits, including health insurance and Medicare Part B reimbursement. *See Reese*, 574 F.3d at 322. The language in the collective bargaining agreements is similar to the language discussed in *Reese*. *See id.* The agreements guarantee the retirees "[t]he same benefits as for the employees and their dependents." The benefits given to the active employees include group insurance benefits that are paid by the Company and reimbursement for the full cost of Medicare Part B coverage. (*See, e.g.*, docket no. 229-2, Plaintiffs' Master Ex. 17.7, at 56, 101-105) (1982-1985 collective bargaining agreement).) Moreover, the agreements expressly provide that the company will "pay the cost of such insurance for the retiree and his dependents." (*See, e.g.*, *id.*) This language unambiguously demonstrates the parties' intent that the benefits, both group health insurance and Medicare Part B insurance, are vested. *See Reese*, 574 F.3d at 322; *see also Golden v. Kelsey-Hayes Co.*, 954 F. Supp. 1173, 1178 (E.D. Mich. 1997); *Cole*, 549 F.3d at 1070-71.

The 1998 Settlement Agreement language further demonstrates the parties' intent to vest reimbursement of the Medicare Part B insurance premium. It states that all "retirees of record as of July 31, 1998" will receive the full "Medicare Part 'B' coverage that was provided for under the Pension Plan in effect in 1991, but deleted from the plan during 1991, and then reimbursed to retirees, from assets of the company." (Docket no. 227-19, Plaintiffs' Master Ex. 16.18.) In the context of the settlement agreement, this language permits only one construction: namely, that the retirees will pay nothing toward the Medicare Part B premium and that the company will pay the full amount, with the first $11.70 of the premium paid by the Pension Plan and any additional premium

24

paid directly by the company to cover the full cost. (*See id.*) Indeed, the Agreement provides that later-retiring employees will receive either a flat $43.80 reimbursement per month, regardless of how expensive the Medicare Part B premium becomes, or no Medicare Part B reimbursement at all. (*Id.*) Obviously, then, the earlier retirees were not capped at the lower reimbursement amount of $11.70. That would treat the later retirees better than the earlier ones, when the parties intent was just the opposite. Moreover, the uniform pattern of practice,[5] from the 1970s through 2006, when the controversy arose, was for the company to cover the full cost of the Medicare Part B premium for qualifying retirees, using a combination of sources. Employees paid nothing. This was the full Medicare Part B benefit guaranteed under the 1998 Settlement Agreement.

There are contextual clues, as well, that the parties' intended to provide lifetime benefits to the retirees. *See Reese*, 574 F.3d at 322. For example, some benefits provided by the collective bargaining agreements "were subject to express durational limitations while retiree health benefits were not." *Id.* "[T]he inclusion of specific durational limitations in other provisions suggests that retiree benefits, not so specifically limited, were intended to survive." *Id.* (alterations and quotation omitted). Additionally, the agreements provided either coordination or integration of the health insurance and Medicare Part B insurance, which shows that the parties intended to include both types of coverage in their agreements. *Cf. id.* Construing the provisions consistently with the whole and interpreting the agreement "to avoid illusory promises and superfluous provisions" also leads to the

---

[5] The record includes evidence of a handful of different payment of Medicare Part B reimbursement amounts for different retirees, but neither party can tie the instances to a uniform policy, practice, or claimed legal right. Until this dispute arose, a qualifying retiree receiving less than full reimbursement of Medicare Part B premiums simply informed the company, and the company bumped the retiree to full reimbursement. The instances of lesser reimbursement appear to be examples of inevitable mistakes or oversights that naturally arise in administering company plans for many different retirees over many years. They do not create a genuine issue of fact for trial.

conclusion that the parties intended to vest the retirees benefits. *See Cole*, 549 F.3d at 1069. Indeed, if the benefits were not contractually vested for qualifying retirees, it would be impossible to make sense of the early retirement incentives of pre-January 1, 1994, for general healthcare, and pre-August 1, 1998, for Medicare Part B.

### 3. Rejection of Defendants' Arguments

Defendants contend that the collective bargaining agreements do not vest lifetime benefits. They make four arguments, none of which has merit.

First, Defendants contend that the collective bargaining agreements are of limited duration. It is true that the collective bargaining agreements contain general durational clauses that state, for example: "The insurance program as set forth in Exhibit A is agreed to for the duration of this contract." This kind of general clause, however, does not introduce any ambiguity regarding a specific promise of vested retiree benefits. *See Cole*, 549 F.3d at 1071, 1072. In this Circuit, "general durational clauses cannot trump contractual promises of lifetime retiree healthcare benefits." *Id.* at 1071. Instead, general durational clauses limit "the length of the CBAs and not the period of time contemplated for retiree benefits." *Id.*; *see also Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006) (holding that general durational clauses affect only "*future* retirees– that is, someone who retired after the expiration of a particular CBA would not be entitled to the previous benefits, but is rather entitled only to those benefits newly negotiated under a new CBA"). A "general durational clause says nothing about the vesting of retiree benefits" unless it contains "specific durational language referring to the retiree benefits themselves." *Cole*, 549 F.3d at 1073 (quotation omitted). The durational clauses in this case do not specifically refer to the retiree

benefits. *See id.* Nor do they unambiguously and expressly limit the duration of retirees' benefits. *See id.* Accordingly, they are general durational clauses that do not limit those benefits. *See id.*

Second, Defendants contend that the plan summary documents contain reservations of rights that permits them to amend the benefits. As a general rule, an existing contract or collective bargaining agreement "cannot be unilaterally modified." *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 444 (6th Cir. 2007) (internal quotation marks omitted). Indeed, "employers are statutorily barred from effectuating unilateral modifications of existing collective bargaining agreements." *Id.* (alterations and internal quotation marks omitted). This general rule is qualified, however, by a special rule for plan summary documents. A plan summary document can prevent retiree benefits from vesting if (1) it includes "unqualified reservation-of-rights language," (2) the unqualified language provides the employer with a "unilateral right . . . to terminate coverage," and (3) the union fails to grieve or object to such language. *Reese*, 574 F.3d at 323; *Prater*, 505 F.3d at 444. Defendants contend that the plan summary documents in this case meet that test.

Defendants' contention is without merit. The reservation in the plan summary documents on which Defendants rely states merely: "It is hoped that this Plan will be continued indefinitely, but, as is customary in group plans, the right of change or discontinuance at any time must be reserved." (docket no. 189-47, Plaintiffs' Bates No. 1692, 1711.) This language is not an unqualified statement that the employer retained the unilateral right to amend and terminate the plan. *See Reese*, 574 F.3d at 323. Accordingly, Defendants fail the first requirement of the test. *See id.*

Defendants also fail the second requirement of the test. Even if a plan summary document contains language that recites an unqualified reservation of a unilateral right of termination, the language is not effective if the plan summary document also reaffirms the primacy of the underlying

collective bargaining agreement.  *See id.*; *Prater*, 505 F.3d at 444, 445.  So, if a plan summary document contains language "reminding readers that the contracts represent the full commitments between the parties," *Reese*, 574 F.3d at 323 (internal quotation marks omitted), then the contract documents trump any reservation language in the plan summary document.  This is because a union cannot fairly be expected to protest when the plan summary document makes it clear that the collective bargaining agreement, not the plan summary document, controls the conflict.  *Id.*; *Prater*, 505 F.3d at 445.  That is what we have here.  *See Prater*, 505 F.3d at 444.  The plan summary documents state that where the plain language in the booklet contradicts or confuses the language in the legal documents, "the wording in the legal document will apply."  (*See, e.g.*, docket no. 189-16 at 3.)  Each of the plan summary documents expressly affirms that the collective bargaining agreements control the benefits, not the plan summary documents.  The summaries' failure to explicitly renounce the collective bargaining agreements prevents them from being be interpreted to permit Defendants to unilaterally terminate or amend the contractual benefts.  *Prater*, 505 F.3d at 445.

Defendants' third contention against vesting is that there is a presumption that, in the absence of explicit language vesting the benefits, healthcare benefits are not vested.  For this proposition, Defendants rely on Seventh Circuit precedent.  *See Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481 (7th Cir. 2006).  Although this presumption appears to be the law in the Seventh Circuit, *see id.*, it does not apply in the Sixth Circuit, *see Cole*, 549 F.3d at 1069.  Indeed, precisely the opposite presumption is true in the Sixth Circuit.  *See id.* (holding that even if the agreement does not explicitly say that the rights are vested, a court may find that the parties intended to vest the rights). The Sixth Circuit holds "that retiree benefits are in a sense 'status' benefits which, as such, carry

with them an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Id.* (internal quotation marks and alteration omitted). As discussed above, this inference does not create a legal presumption that retiree benefits are vested for life, but it exists "if the context and other available evidence indicate an intent to vest." *Id.* (quotation omitted). Defendants' reliance on contrary Seventh Circuit precedent is without merit.

Even in the Seventh Circuit, the language in these agreements would be held to provide vested, lifetime benefits. Each of the collective bargaining agreements provides fully paid insurance benefits to the active employees and full payment of Medicare Part B insurance premiums for employees over the age of 65. Each of the agreements gives to retirees the same health benefits enjoyed by the employees and their dependents. Furthermore, each of the agreements states that "[t]he Company agrees to pay the cost of such insurance for the retiree and his dependents." The contract language unambiguously demonstrates the parties' intent to vest lifetime healthcare benefits to the retirees. *See Reese*, 574 F.3d at 322; *Cole*, 549 F.3d at 1070-71; *Golden*, 954 F. Supp. at 1178. Indeed, Defendants have put forward no plan language that contradicts this unambiguous intent. Their argument relies on inapplicable agreements and extrinsic evidence in the plan summary documents which, for the reasons discussed above, do not actually contradict or challenge the language in the collective bargaining agreements.

Fourth, Defendants contend that the retirees do not have a vested right to reimbursement of the Medicare Part B insurance premium because the 2000 Shutdown Agreement terminated the 1998 collective bargaining agreement and the corresponding 1998 Settlement Agreement. This argument is without merit. First, the vested right arises from the earlier collective bargaining agreements, and no subsequent agreement between the Union and Defendants could lawfully permit Defendants to

amend or terminate the benefits that had already vested to the retirees.  *See, e.g.*, *Wood*, 2010 WL

2195791 at *6; *see also Prater*, 505 F.3d at 444.  The Shutdown Agreement applies only to active

members of the Union.  (*See* docket no. 228-7, Plaintiffs' Master Ex. 17.6, at Defendants' Bates No.

2058 ("[I]t is agreed by the Company and the Union on behalf of itself and the employees it

represents . . . ".)  It is not an agreement between the retirees and Defendants, so it cannot trump the

contractual promises of lifetime retiree healthcare benefits for those individuals whose right to

reimbursement already vested.  *Wood*, 2010 WL 2195791 at *6.   Second, the 2000 Shutdown

Agreement does not even purport to terminate the rights that had already vested under the 1998

Settlement Agreement.  The 2000 Shutdown Agreement states:

> Upon acceptance of this Shutdown Agreement, this Shutdown
> Agreement shall become an addendum to the current Collective
> Bargaining Agreement between the Company and the Union (the
> stated term of which is June 6, 1998 through June 6, 2003).  Upon
> acceptance of this Shutdown Agreement the parties shall be bound by
> this Shutdown Agreement and the current Collective Bargaining
> Agreement and relevant plan documents as modified by this
> Shutdown Agreement.  This Shutdown Agreement and the 1998
> Collective Bargaining Agreement and all agreements supplemental
> thereto shall automatically terminate on March 31, 2001 . . . .  If there
> is any conflict between the 1998 Collective Bargaining Agreement
> and this Shutdown Agreement, this Shutdown Agreement shall
> prevail.

(docket no. 159-24 Art. III § 1 (emphasis added).)  By its terms, the 2000 Shutdown Agreement

affects only the window in which the individuals who retired after the 2000 Shutdown Agreement

could retire with the benefits of the amended 1998 collective bargaining agreement.  It does not even

purport to change the rights of those employees who had already retired.  Accordingly, the 2000

Shutdown Agreement does not limit the reimbursement for the retirees for whom the benefit already

vested.

The Plaintiffs have established for the purposes of summary judgment that the language of the collective bargaining agreements vest their right to lifetime health benefits.

**B.      Extrinsic Evidence**

Even if the collective bargaining agreement language is ambiguous, however, the entire record of extrinsic evidence demonstrates, without a single contradictory voice, that the parties intended to vest lifetime retiree healthcare benefits.  Individuals from both sides of the bargaining table, including members of company management and Union representatives, testified at deposition and stated in affidavits that the company and the employees intended to provide retirees with fully paid, vested, lifetime medical benefits.  Mr. Keasey, a participant in most of the negotiations and a drafter of the collective bargaining agreements; Ms. McCurry, the administrator of health insurance and pension benefits at the Sturgis plant; Mr. Lampe, another main participant in the collective bargaining agreement negotiations; and Mr. Oetman, an International Representative for the union at the Sturgis plant from 1984 through 1995, all stated that the Union and the company intended to vest lifetime group health insurance for the retirees.  The letters Cooper Industries sent to employees of the Sturgis plant on their retirement, the company's economic offers from various negotiations, and the retirement applications also demonstrate this intent.  Even Defendants' own due diligence at the time of purchase shows that the agreements vested lifetime benefits.  Its attorneys' "summary of the retiree medical and life insurance benefits" states that union employees who retired before January 1, 1994, are entitled to "[l]ifetime retiree coverage" of medical benefits.  (docket no. 226-4, Plaintiff's Master Exhibit 15.3.)

The evidence also demonstrates the intent to vest full reimbursement for Medicare Part B insurance.  The 1985 bargaining summary, for example, states that the company will reimburse the

retirees and their spouses for the cost of the Medicare Part B premium. The retirement letters and application packages sent by the company between 1988 and 1993 state exactly the same thing. Mr. Oetman, an International Representative for the union at the Sturgis plant from 1984 through 1995, and Mr. Webster, the International Representative for the union after Mr. Oetman, also confirmed that the company and the Union intended to vest full reimbursement for Medicare Part B insurance. Mr. Webster was also part of the team that negotiated the 1998 Settlement Agreement for Medicare Part B reimbursement, and he stated that the 1998 Settlement Agreement was intended to vest full Medicare Part B reimbursement for those who retired prior to August 1, 1998.

The available extrinsic evidence would resolve in any circuit the issue of the parties' intent to vest. Indeed, it is so entirely one sided that no genuine question of intent can remain. Accordingly, summary judgment in favor of Plaintiffs is appropriate on the question of whether the parties intended to vest lifetime healthcare benefits for the retirees. *Cole*, 549 F.3d at 1069.

## III.    Level of Benefits

In addition to the basic dispute regarding whether the collective bargaining agreements vested the retirees' health benefits, the parties dispute whether certain benefits were provided under the collective bargaining agreements. The Court has addressed some of these issues already, and now will summarize its conclusions on all the disputed benefit levels presented by the parties. The Court has already stated the guiding principles: (1) all employees who retired before August 1, 1998, which includes the entire Plaintiff class, are entitled to full reimbursement of the premium cost of Medicare Part B insurance; (2) all employees who retired before January 1, 1986, are entitled to the full first dollar healthcare coverage without any contribution to the premium cost; (3) all employees who retired after January 1, 1986, but before January 1, 1994, are entitled to the level of health care

32

coverage then in effect with the limited exception of a $20 per month contribution to the cost of coverage from age 62 to 65; and (4) all employees who retired on or after January 1, 1994, are entitled to limited, if any, ongoing healthcare benefits other than the Medicare Part B reimbursement.

Plaintiffs move for summary judgment on two separate benefit-level issues, which appear to be the only meaningful disputes between the parties on special benefit levels. Plaintiffs contend that (1) employees who retired after 1985 but before January 1, 1994, are entitled to 100% coverage of outpatient surgery, diagnostic, and testing services; and (2) pre-1986 retirees are entitled to coordination of their group insurance and Medicare Part B insurance benefits in such a way that retirees incur no out-of-pocket expense. Defendants dispute these contentions. Under *Yard-Man*, a court must apply the basic rules of contract interpretation to determine whether the parties intended a particular right to survive the end of the contract. *See Cole*, 549 F.3d at 1069. The court must first consider the language in the collective bargaining agreement. *Id.* In doing so, the court must construe each of the provisions consistently with the whole, and it should interpret the agreement "to avoid illusory promises and superfluous provisions." *Id.* If the collective bargaining agreement is ambiguous, "the court may resort to extrinsic evidence to ascertain whether the parties intended for the benefits to survive the agreement." *Id.* at 1070. If the available extrinsic evidence conclusively resolves the issue and no question of intent remains, then summary judgment is appropriate. *Id.* If the extrinsic evidence does not conclusively resolve the issue, however, summary judgment is improper. *Id.*

**A.** **Employees who retired between January 1, 1986, and January 1, 1994, are entitled to full reimbursement of outpatient services.**

All of the evidence in the record shows that employees who retired between January 1, 1986, and January 1, 1994, are entitled to full reimbursement of outpatient services. *See id.* First, the language of later agreements supports this conclusion. The 1993 collective bargaining agreement states that "[e]ffective January 1, 1994, all outpatient coverage will be reimbursed at the 80% level instead of the present 100% coverage." (docket no. 228-5, Plaintiffs Master Ex. 17.4, at 89.) Mr. Keasey, who participated in the negotiations of the 1986 amendment, also testified that the parties intended outpatient surgery and diagnostics to be covered at 100% for employees who retired during this time period. (*See, e.g.*, docket no. 224-9, Plaintiffs' Master Ex. 8, at 47-48.) Additionally, Ms. McCurry, the administrator of health insurance and pension benefits at the Sturgis plant until it closed, stated that the plans covering 1986 through 1993 provided 100% coverage for outpatient services. (docket no. 224-7, Plaintiffs' Master Ex. 6, ¶ 5.) The economic proposals from Cooper Industries that relate to the 1993 collective bargaining agreement also support this conclusion. They state that employees retiring on or after January 1, 1994, will receive 80% coverage for outpatient services "instead of the present 100% coverage." (docket nos. 227-24, 227-25, Plaintiffs' Master Exs. 16.23, 16.24.) Even Defendants' summary of retiree benefits confirms this coverage for employees who retired between January 1, 1986, and January 1, 1994. It states that for employees who "[r]etired 1/1/86 to 12/31/93," coverage for "[o]utpatient diagnostic and Xrays" are covered at "100%." (docket no. 215-16, Defendants' Master Ex. AX.) "For employees who "[r]etired on or after 1/1/94," by contrast, "[o]utpatient diagnostic and Xrays" are covered at "80%." (*Id.*) Accordingly, the retirees are entitled to summary judgment providing employees who retired

34

from the Sturgis plant between January 1, 1986, and January 1, 1994, 100% coverage for outpatient surgery and diagnostic services. *Cole*, 549 F.3d at 1070.

### B. Employees who retired before January 1, 1986, are entitled to coordination of benefits so that they incur no out-of pocket expense.

The issue here involves situations in which both Medicare Part B insurance and private company-provided health insurance cover a particular expense, but each insurance provides for only 80% reimbursement. Under the plans in effect here, Medicare Part B always provided primary coverage up to any applicable limits, such as the 80% reimbursement level. This is, in part, why employees and retirees were required to enroll in Medicare Part B. The issue is whether the retiree, or the private health care plan picked up the remaining 20% co-payment. Under the "coordinated" plan, the private insurance would pick up the 20% co-payment, as long as the amount was within the dollar amount the private insurance would have paid in the absence of any Medicare Part B payment. Under the "integrated" plan, however, the retiree picked up the 20% because the private health care benefit applied only if its stated benefit level exceeded the levels provided by Medicare Part B.

Up to 1986, the collective bargaining agreements provided "the same coordination of benefits as the General Motors - U.A.W." (*See, e.g.*, docket no. 229-2, Plaintiffs' Master Ex. 17.7, at 56, 101-05 (1982-1985 collective bargaining agreement).) All of the extrinsic evidence in the record shows that before 1986, the parties intended to provide retirees with coordinated benefits that left the retiree with no out-of-pocket expense. Medicare Part B paid the claim first, and the retirees' group insurance picked up the remainder of the bill. Ms. McCurry, the administrator of health insurance and pension benefits at the Sturgis plant until it closed, stated that the pre-1986 agreements provided for insurance that coordinated with Medicare. (docket no. 224-7, Plaintiffs' Master Ex. 6,

¶ 4.)  In 1986, the program changed to an "integrated" system.  Ms. McCurry stated that beginning in 1986, the agreements provided for insurance that was integrated with Medicare.  (docket no. 224-7, Plaintiffs' Master Ex. 6, ¶ 6.)  Cooper Industries sent a letter to its employees in 1988, which noted the change beginning January 1, 1986.  It demonstrates that as of January 1, 1986, when and employee or retiree reached "age 65 and become eligible for Medicare, the benefit payable for our plan will be reduced by the amount paid by Medicare.  This means your total benefits received from Medicare and our plan will normally total 80% of your covered expenses less deductibles."  (docket no. 227-27, Plaintiffs' Master Ex. 16.26.)  Before 1986, however, full coordination was in effect.

Even Defendants' summary of the retirees benefits confirms this.  Defendant's summary states that, for employees who "[r]etired prior to 1/1/86," Medicare benefits are subject to "coordination" where "Medicare pays primary.  Aetna pays secondary."  (docket no. 215-16, Defendants' Master Ex. AX.)  It further states: "Coordination of Benefits: Payment may be reduced so that the total you can receive under Medicare and Aetna will not be more than your total bill."  (*Id.*)  By contrast, the summary states that, for employees who retired from "1/1/86 to 12/31/93," Medicare payments are subject to "Integration/Carve Out" where "Medicare pays primary.  Aetna pays secondary."  (*Id.*)  Accordingly, the retirees are entitled to summary judgment on the fact that their insurance benefits were coordinated with Medicare benefits for those retirees who retired prior to January 1, 1986, so that they incurred no out-of-pocket expenses for matters covered by both Medicare Part B and private insurance.  *See Cole*, 549 F.3d at 1070.

IV.    **Statute of Limitations**

Defendants' final contention is that some of the retirees' claims for Medicare Part B reimbursement are barred by the statute of limitations.  Defendants contend that there is a six-year

statute of limitations under both the LMRA and ERISA. *See Santino v. Provident Life and Acc. Ins. Co.*, 276 F.3d 772, 776 (6th Cir. 2001) (holding that Michigan's six-year statute of limitations for breaches of contract is most analogous and should be used for ERISA violations); *Biros v. Spalding-Evenflo Co.*, No. 88-712, 1989 WL 201625, *3 (W.D. Mich. Aug. 1, 1989) (holding that Michigan's six-year statute of limitations for breaches of contract is most analogous and should be used for LMRA violations); *see also Winnett v. Caterpillar, Inc.*, No. 08-6236, --- F.3d ----, 2010 WL 2499512, *4 (6th Cir. June 22, 2010). They submit that some of the retirees' have been receiving less than full reimbursement for Medicare Part B insurance for more than six years, and they therefore contend that these retirees' claims for full Medicare Part B reimbursement are barred.

Defendants' contention is without merit. Under Sixth Circuit precedent, Plaintiffs claims accrued less than six years before Plaintiffs filed this action. *See Winnett*, 2010 WL 2499512, *5. In *Winnett*, the Sixth Circuit held that an employer must clearly repudiate the rights provided by a collective bargaining agreement before the retirees claims will accrue. *Id.* Retirees claims do not accrue when they feel the affects of the change, but when the employer gives unequivocal notice that it is repudiating the collective bargaining agreement. *Id.* at *5, 6. The accrual of this cause of action "turns on when []class members *knew* of [Defendants' announced] change in benefits, not when they *felt* its effects." *Id.* (citing *Carey v. Local 363 Pension Plan*, 201 F.3d 44, 47-48 (2d Cir. 1999) (holding that a cause of action accrues upon "clear repudiation," not when the benefits are denied); *Union Pac. R.R. v. Beckham*, 138 F.3d 325, 330-31 (8th Cir. 1998) (same); *Daill v. Local 73 Pension Fund*, 100 F.3d 62, 65-67 (7th Cir. 1996) (same)). Indeed, the limitations period must be keyed to the time when the Defendants announce the repudiation because it must start at the same point "for every employee or retiree." *Id.*

37

Here, Defendants announced their repudiation of the terms of the collective bargaining agreement in 2005 and 2006. *Id.* Before that time, Defendants may have inadvertently mishandled the claims of a handful of retirees, but the undisputed evidence shows that Defendants' promptly and fully corrected the mistakes. (*See, e.g.*, docket no. 224-8, Plaintiffs' Master Ex. 7, ¶ 5.) It was only recently that Defendants gave notice of their intent not to be bound by their agreement. Plaintiffs claims"accrue[d] on the date of the company's announcement and notice," and they filed this action within six years of those announcements. Accordingly, Plaintiffs claims are timely. *Winnett*, 2010 WL 2499512, *5-7.

## Conclusion

The collective bargaining agreements unambiguously establish that the Plaintiff retirees, their spouses and dependents are entitled to vested, lifetime health benefits, including group insurance at various levels in effect at the time of retirement, and full reimbursement of Medicare Part B insurance premiums. The language of the agreements, the contextual clues, and the extrinsic evidence all establishes this conclusion. Even the representatives who negotiated on behalf of the company and Defendants' own legal due diligence analysis agree on this point. Because the collective bargaining agreements vest the benefits and there is no contradictory testimony or extrinsic evidence to dispute the levels of benefits established by the Plaintiffs, summary judgment for Plaintiffs is appropriate.


Dated:     July 6, 2010                      /s/ Robert J. Jonker
                                          ROBERT J. JONKER
                                          UNITED STATES DISTRICT JUDGE


38